Marco Antonio BLANCAS, Movant,

v.

UNITED STATES of America,
Respondent.

Nos. EP–03–CA–0307–DB,
EP–98–CR–1194–DB.

United States District Court,
W.D. Texas,
El Paso Division.

Nov. 9, 2004.

Marco Antonio Blancas, Beaumont, TX, pro se.

*MEMORANDUM ORDER AND OPIN- ION DENYING MOTION TO VA- CATE, SET ASIDE OR CORRECT SENTENCE PURSUANT TO TI- TLE 28 U.S.C. § 2255*

BRIONES, District Judge.

On this day, the Court considered Marco Antonio Blancas' ("Blancas") Motion to Vacate, Set Aside or Correct Sentence ("Motion to Vacate") [Docket no. 159], filed on August 11, 2003, pursuant to 28 U.S.C. § 2255. The Government filed a Response to Blancas' Motion to Vacate ("Response") [Docket no. 163] on October 7, 2003. Blancas' Reply Brief to the Government's Response ("Reply") [Docket no. 164] followed on October 20, 2003. After carefully considering the pleadings, the record of the proceedings in cause no. EP–98–CR–1194–DB, and the testimony elicited at an evidentiary hearing held on September 22, 2004, the Court concludes that Blancas' claims are either procedurally barred from review, or alternatively, entirely without merit. Accordingly, those claims are denied and Blancas' Motion to Vacate is dismissed with prejudice.

## I. FACTUAL AND PROCEDURAL HISTORY

### A. Criminal Cause No. EP–98–CR–1194–DB

On October 4, 2000, the Grand Jury sitting in El Paso, Texas, returned a twelve-count Superseding Indictment [Docket no. 21] against Blancas and three co-defendants.[1] The Superseding Indictment named Blancas in only the first two counts. Specifically, the Government alleged that, between June 1997 and January 1999, Blancas conspired to import 5 kilograms or more of cocaine and 1000 kilograms or more of marijuana, in violation of 21 U.S.C. §§ 952(a), 960(a)(1), 960(b)(1)(G), and 960(b)(1)(B)(ii) (Count One); and conspired to possess with intent to distribute this same quantity of cocaine and marijuana, in violation of 21 U.S.C. §§ 846, 841(a)(1), 841(b)(1)(A)(ii)(II) (Count Two).

Blancas was arrested on October 22, 2000. Attorney Kathleen Salome Smith

---

1. Blancas' co-defendants in this case were Ricardo Carillo–Cano, Alfredo Carillo–Cano (Ricardo's brother), and Luis Fernando Blancas (Blancas' brother). The sealed, one-count Indictment [Docket no. 1], which the Grand Jury returned on September 9, 1998, named only Ricardo–Carillo–Cano, charging him with conspiracy to possess two controlled substances, namely, 5 kilograms or more of cocaine and 1000 kilograms or more of marijuana, with the intent to distribute them, in violation of 21 U.S.C. §§ 846 and 841(a)(1).

("Smith"), who was then professionally associated with attorney Joseph "Sib" Abraham ("Abraham"), entered an appearance as Blancas' attorney of record on October 23, 2000. On October 26, 2000, Blancas entered a plea of not guilty to the charges alleged in the Superseding Indictment. The Court held a detention hearing on the same day and ordered Blancas detained without bond pending trial.

Roughly five weeks later, on December 6, 2000, the Grand Jury returned a seventeen-count Second Superseding Indictment [Docket no. 47] against Blancas. The five new counts contained in the Second Superseding Indictment charged Blancas with two counts of hostage taking, in violation of 18 U.S.C. § 1203 (Counts Thirteen and Fourteen); two counts of conspiring to take hostages, also in violation of 18 U.S.C. § 1203 (Counts Fifteen and Sixteen);[2] and one count of money laundering, in violation of 19 U.S.C. §§ 1956(h) and 1956(a)(1) (Count Seventeen). Blancas entered a plea of not guilty to the Second Superseding Indictment on December 15, 2000.

The Grand Jury returned a Third Superseding Indictment [Docket no. 88] on January 23, 2002. The Third Superseding Indictment charged Blancas with two counts of witness-tampering, in violation of 18 U.S.C. § 1512(a)(1)(A) (Counts Eigh-

teen and Nineteen). Blancas entered a plea of not guilty on March 1, 2002.

The Grand Jury returned yet a Fourth Superseding Indictment [Docket no. 109] on March 20, 2002. The Fourth Superseding Indictment carried forward each of the counts previously alleged against Blancas and additionally charged him with one count of conspiring to use interstate commerce facilities in commission of murder-for-hire, in violation of 18 U.S.C. § 1958 (Count Twenty).[3] Blancas entered a plea of not guilty to the Fourth Superseding Indictment on March 29, 2002.

On March 27, 2002, Abraham moved to sever Counts Eighteen, Nineteen, and Twenty from Counts One through Seventeen, pursuant to Federal Rules of Criminal Procedure 8(a) and 14 [Docket no. 116]. In a supporting Memorandum of Law [Docket no. 117], Abraham argued that the Third and Fourth Superseding Indictments prejudicially joined Counts Eighteen, Nineteen, and Twenty to Counts One through Seventeen. He asserted that the evidence admissible to prove the charges in Counts Eighteen, Nineteen, and Twenty was irrelevant to prove the drug conspiracy, money laundering and hostage taking charges encompassed in Counts One through Seventeen. Further, Abraham urged, the highly inflammatory nature of the proof related to Blancas' alleged threat

---

**2.** The Government alleged that Blancas and the Carillo–Cano brothers seized, detained, and threatened to continue to detain, injure, or kill Jose Luis Sahagun and Santiago Sahagun ("the Sahagun brothers") to compel undercover Federal Bureau of Investigations ("FBI") Special Agent Rene Medina (known to Blancas as "Jaime Spencer Aguirre") to pay ransom for the brothers' release. *See* Second Superseding Indictment, Docket no. 47. The Government further alleged that the defendants' conduct resulted in the deaths of both brothers. *See id.*

**3.** The Government alleged that Blancas had attempted to kill witnesses Ubaldo Sierra and Manuel Sordo to prevent them from testifying against him at his trial on the charges alleged in the previous Indictments. While Blancas was being held in the El Paso County Detention Facility, FBI agents arranged for an informant incarcerated in the same cell to wear a body wire. With that body wire, the informant recorded conversations between himself and Blancas. During those conversations, Blancas allegedly incriminated himself on the witness-tampering and murder-for-hire charges. *See* Def.'s Mot. to Suppress, Docket no. 129, pp. 2–4.

to murder the informants who would testify against him would seriously prejudice Blancas' ability to defend Counts One through Seventeen. On April 3, 2002, shortly after filing his Motion to Sever, Abraham filed a Motion to Suppress Evidence Derived from Government Misconduct [Docket no. 128].[4]

The Court held a hearing on both Motions on April 26, 2004. In an Order dated April 29, 2002 [Docket no. 136], the Court granted in part and denied in part Abraham's Motion to Suppress. The Court ruled that any statements made by Blancas to the cooperating witness before that witness entered into an agreement with the Federal Bureau of Investigations ("FBI") were admissible against him. It similarly concluded that statements Blancas made to the cooperating witness after that witness agreed to cooperate with the FBI and which concerned crimes for which Blancas had not yet been charged (*i.e.*, witness-tampering and murder-for-hire), were admissible. In contrast, the Court held that statements Blancas made after the cooperating witness had agreed to cooperate with the FBI and which pertained to crimes for which Blancas had already been charged were not admissible. The Court advised the parties that it would therefore permit the Government to introduce redacted tape recordings and transcripts of conversations between Blancas and the cooperating witness.[5] The Court subsequently denied Abraham's Motion to Sever Counts Eighteen, Nineteen, and Twenty in an Order dated July 11, 2002 [Docket no. 137].

4. *See supra* text accompanying note 3.

5. The Court ordered the parties to meet and redact the objectionable portions of the audio tapes. The parties reached an agreement on all but certain statements establishing Blancas' motive for attempting to kill witness

Jury selection and trial were scheduled to begin on August 12, 2002. On August 9, 2002, pursuant to a plea agreement filed the same day, Blancas waived his right to be indicted by the Grand Jury and consented to be charged via Information. That Information [Docket no. 151], to which he agreed to plead guilty, charged him with one count of hostage taking (regarding solely Santiago Sahagun), in violation of 18 U.S.C. § 1203. In exchange, the Government agreed to dismiss the pending counts contained in the Fourth Superseding Indictment. The parties further agreed to jointly recommend a 300–month (*i.e.*, 25–year) term of imprisonment. Regarding Blancas' right to appeal, the plea agreement expressly provided:

By entering into this agreement, and as a term of this agreement, the Defendant voluntarily and knowingly waives his right to appeal his sentence on any ground, including any appeal right conferred by 18 U.S.C. § 3742; provided, however, that this waiver does not extend to his right to appeal any upward departure pursuant to U.S.S.G. § 5K2.0 from the Guideline range found by the District Court and does not extend to his right to appeal a decision by the District Court [ ] that the Defendant is not eligible for a downward departure under 18 U.S.C. § 3553(f) as referenced above. The Defendant also knowingly and voluntarily waives his right to contest his sentence in any post-conviction proceeding, including but not limited to, a proceeding pursuant to 28 U.S.C. § 2255; *provided,* however, that consistent with principles of professional re-

Ubaldo Sierra and recording Blancas' order to proceed with the killing. Blancas filed a Motion to Redact [Docket no. 138] these portions of the tape on July 26, 2002, which the Court denied in an Order dated August 1, 2002 [Docket no. 141].

sponsibility imposed on Defendant's counsel and counsel for the Government, the Defendant does not waive his right to challenge his sentence to the extent that it is the result of a violation of his constitutional rights based on claims of ineffective assistance of counsel or prosecutorial misconduct of constitutional dimension.[6]

In a proceeding held the same day, Blancas entered a plea of guilty and admitted that the factual basis alleged by the Government was true and correct.[7] That hearing's transcript shows that a certified translator, Roberto Perez–Diaz, was sworn in at the beginning of the hearing to interpret for Blancas.[8] The Court accepted Blancas' plea after establishing to its satisfaction that the plea was voluntary and intelligent and that the factual basis for it was true and correct. Because Blancas, with Abraham's concurrence, indicated that he wished to proceed directly to sentencing, the Court did not await the preparation of a Presentence Report, but instead sentenced Blancas immediately after the plea to a 300–month term of imprisonment, a 5–year term of supervised release, and a $100 special assessment. The Court entered Final Judgment [Docket no. 156] on August 14, 2002. Blancas did not appeal.

## B. Blancas' Motion to Vacate

Blancas raises six overlapping claims in his Motion to Vacate. First, Blancas argues that his guilty plea was unlawfully induced or involuntary because he did not understand the nature of the charge and the consequences of his plea ("Ground One").[9] To support his claim, Blancas pleads the following facts: (1) the Court subjected him to boilerplate questioning, specifically designed to elicit the desired

---

**6.** Docket no. 153, Plea Agreement of Marco Antonio Blancas, dated August 9, 2002 (emphasis in original).

**7.** The Government stood prepared to prove the following:

[B]eginning in September of 1997, Marco Antonio Blancas arranged for the crossing of marijuana into the United States from Juarez, Mexico. [He] used Santiago Sahagun to cross this marijuana into the United States. Rene Medina, an undercover FBI agent, represented himself to be an individual named Jaime Spencer Aguirre who was capable of allowing this marijuana to enter the United States without being seized by United States Customs.

A total of 23,000 pounds of marijuana was crossed into the United States and seized by the FBI without the knowledge of Marco Antonio Blancas or Santiago Sahagun.

Beginning in November of 1997, Marco Antonio Blancas demanded payment for the marijuana which was imported into the United States. These demands were communicated to Rene Medina acting in his undercover capacity as Jaime Spencer Aguirre.

On November 11, 1997, Santiago Sahagun was abducted in Juarez, Mexico, at the orders of Marco Antonio Blancas.

The purpose of this abduction was to secure payment for the marijuana which had been shipped into the United States.

Rene Medina was contacted in his undercover capacity as Jaime Spencer Aguirre and informed that Santiago Sahagun was being held in Juarez and would not be released until payment was made for the marijuana.

Threats to kill Santiago Sahagun were communicated to the undercover agent if money was not paid for the marijuana.

On November 13, 1997, Rene Medina wire-transferred $50,000 in United States currency from El Paso, Texas, to a bank account in Juarez, Mexico, to obtain the release of Santiago Sahagun.

On October 22, 2000, Marco Antonio Blancas was arrested in El Paso, Texas. Plea Tr. at 13–14.

**8.** *See id.* at 2.

**9.** *See* Movant's Mot. to Vacate, Docket no. 159, p. 6.

response, without engaging in any meaningful attempt to confirm that he actually understood the rights he was waiving; (2) he did not know the elements of the offense to which he pleaded guilty and the factual basis for the plea was "trumped-up"; (3) counsel frightened him into making "a last-minute choice between pleading guilty or be[ing] executed"; told him that a jury had been picked and that one of the jurors had previously been taken hostage; and additionally told him that he was certain to be found guilty if he went to trial.[10] Therefore, Blancas argues, he lacked the capacity to make a reasoned choice among alternatives.[11]

Second, Blancas argues that he was denied effective assistance of counsel ("Ground Two").[12] He states that he was held in New Mexico and that counsel only came to see him four times.[13] Then, when the U.S. Marshals moved him back to El Paso about a week before trial, counsel was not prepared to try the case.[14] Blancas repeats his earlier claim that counsel scared him with the prospect of a death sentence he actually could not have received.[15] He further argues that a jury was picked without his having waived his right to be present.[16] He also repeats his earlier allegation that counsel told him that one of the jurors had previously been

the victim of hostage taking, and that he was certain to be found guilty.[17] Blancas additionally contends that counsel was unprepared, disorganized, and deceived him.[18] Blancas states that he was "bewildered, confused, and in a state of panic." [19] He argues that he would never had pleaded guilty, but for counsel's poor performance.[20]

Third, Blancas asserts that he was denied his right to appeal ("Ground Three").[21] He says that he is a Mexican citizen, speaks almost no English, and was never sure if there were an interpreter present (or alternatively, states affirmatively that there was no interpreter).[22] He was therefore unaware that he had signed away his appeal rights until after sentencing, when he asked his attorney to appeal and was told that he could not.[23] Blancas asserts that he would have "filed a comprehensive appeal bristling with meritorious issues" but for counsel's alleged failure to ensure that he understood the rights he was waiving.[24]

Fourth, Blancas contends that the Court lacked subject matter jurisdiction and that venue was improper because the crime, if any, occurred in Mexico ("Ground Four").[25] In support of his claim, he states that there has been no crime.[26] The alleged

10. *See id.*

11. *See id.*

12. *See id.* at 7.

13. *See id.*

14. *See id.*

15. *See id.*

16. *See* Movant's Mot. to Vacate, Docket no. 159, p. 7.

17. *See id.*

18. *See id.*

19. *See id.*

20. *See id.*

21. *See id.* at 8.

22. *See id.*

23. *See id.*

24. *Id.*

25. *See* Movant's Mot. to Vacate, Docket no. 159, p. 9.

26. *See id.*

victims are not included in any missing persons list in Mexico and in fact are not missing, he says.[27] Further, Blancas argues, the factual basis for the plea was "erroneous and improper."[28] There was no evidence that he took any hostage.[29] He says that he could not present this claim before now because counsel told him he could not.[30] He would have filed a notice of appeal, but his attorney told him after the fact that he had waived filing any kind of appeal whatsoever.[31] If he had known this, Blancas says, he would never have pleaded guilty.[32] He contends that the waiver "must be treated as a nullity."[33]

Fifth, Blancas argues that he was unlawfully induced to plead guilty under the express promise and belief that he would be released to Mexico in 7 or 8 years ("Ground Five").[34] The promise he says, was "a last-ditch effort to goad him into pleading guilty."[35] Moreover, counsel deliberately misrepresented to him that incriminating evidence obtained by a jailhouse informer was unequivocally admissible, when in fact it was unequivocally inadmissible.[36] Blancas contends that counsel never moved to suppress this evidence and instead used it "as a lever to dupe [him] into pleading."[37] Blancas argues that "had [he] not been deceived by counsel and had counsel made the proper motions and followed them through[,] a

different result would have been had."[38] He asserts that if counsel had moved to suppress the evidence, he would not have been prejudiced and would have gone to trial.[39]

Sixth, Blancas argues that he was denied due process of law and a fair sentencing in violation of Rule 32 of the Federal Rules of Criminal Procedure and 18 U.S.C. § 3553 ("Ground Six").[40] Blancas contends that the Court never made a finding that the information in the record enabled it to exercise its sentencing authority under § 3553 and thus, that sentencing him without benefit of a Presentence Report violated Rule 32(b).[41] Accordingly, argues Blancas, he unintelligently and involuntarily waived his right to have a Presentence Report prepared, in violation of the United States Constitution.[42]

## C. The Government's Response

Regarding Blancas' first claim, that the Court conducted an inadequate plea colloquy which rendered his plea involuntary, the Government responds that the Court personally addressed Blancas on all subjects required by Rule 11 of the Federal Rules of Criminal Procedure. Therefore, Blancas' conclusory statement that there was an absence of "personal interrogations and colloquy" is insufficient to entitle him

27. *See id.*

28. *Id.*

29. *See id.*

30. *See id.*

31. *See id.*

32. *See id.*

33. *Id.*

34. *See id.* at 10.

35. *Id.*

36. *See* Movant's Mot. to Vacate, Docket no. 159, p. 10.

37. *Id.*

38. *Id.*

39. *See id.*

40. *See id.* at 11.

41. *See id.*

42. *See id.*

to relief.[43]  The Government further asserts that Blancas' plea was voluntary, noting that the Court fully explained to him the charges, maximum punishment, and rights he was waiving by pleading guilty.[44] Moreover, the Government emphasizes that Blancas declared his guilt in open court and that his sworn statements enjoy a strong presumption of veracity, especially when compared to later, self-serving statements.[45]  It also argues that, contrary to his allegations, Blancas knew the elements of the charge against him, citing to the portion of the record in which the Court explained what the Government would have to prove, should Blancas choose to proceed to trial.[46]  Lastly, the Government contends, the Court found that the factual basis to which Blancas admitted was sufficient to support his guilty plea.[47]

Regarding Blancas's second and fourth allegations (i.e., that the Court lacked jurisdiction to adjudicate the matter, that venue was improper, and that there was, in fact, no crime, or even proof that a crime had occurred), the Government notes that the record does not support his contentions.[48]  Blancas, it argues, admitted that the factual basis for the Information was true and that he was guilty of the crime charged.[49]  Moreover, the Government continues, Blancas stated on the record that he understood what the Government would be required to prove should the matter proceed to trial.[50]

Concerning Blancas' third claim, that he was improperly sentenced and thus denied due process, the Government argues that Blancas expressly waived the preparation of a Presentence Report, and therefore, there was no Rule 32 violation.[51]  It further asserts that, at sentencing, Blancas did not object to any deviation from 18 U.S.C. § 3553 and therefore waived the issue.  Moreover, the Government notes that the Court proceeded directly to sentencing upon Blancas' express request.[52]

Insofar as Blancas argues that counsel rendered ineffective assistance, the Government responds that Blancas has failed to state facts or to cite to portions of the record to support his contention that counsel performed deficiently or that their deficient performance, if any, prejudiced him.[53] To the extent Blancas alleges that he did not know that he waived his right to appeal and that, after sentencing, he asked his attorneys to file an appeal, the Government notes that Blancas signed a plea agreement in which he expressly waived his right to appeal anything other than the Court's upward departure pursuant to U.S.S.G. § 5K2.0 or its finding that Blancas was not eligible for a downward departure under 18 U.S.C. § 3553(f).[54]  Further, when the Court reviewed the terms of the plea agreement with Blancas, he stated that he understood those terms and the Court's admonishments.[55]  Although Blancas now claims to not have understood,

43.  See Gov't's Resp., Docket no. 163, p. 5.

44.  See id. at 6–7.

45.  See id. at 7.

46.  See id.

47.  See id.

48.  See id. at 13–14.

49.  See Gov't's Resp., Docket no. 163, p. 15.

50.  See id. at 14–15.

51.  See id. at 15–16.

52.  See id. at 16.

53.  See id. at 11.

54.  See id.

55.  See Gov't's Resp., Docket no. 163, p. 13.

because he does not speak English and there was no interpreter present, the Government argues that the record clearly shows that a qualified interpreter was indeed present and that Blancas utilized the interpreter's services throughout the unified plea and sentencing hearing.[56] The Government does not address Blancas' claim that counsel failed to file a notice of appeal upon request, except to argue that Blancas waived his right to appeal.

## II. THE EVIDENTIARY HEARING

### A. The Scope of the Evidentiary Hearing

After reviewing Blancas' claims and the Government's Response, the Court concluded that it must first resolve whether counsel rendered inadequate assistance by failing to file a notice of appeal after being expressly instructed to do so.[57] The posture of Blancas' remaining claims, it explained, hinged on that determination.[58] If, as Blancas alleged, he had been unconstitutionally denied his right to appeal, and that right were restored through collateral review, then his other claims would be properly raised in a direct appeal or dismissed without prejudice while he pursued relief on direct review.[59]

Because Blancas contended that he told Abraham and Smith to file an appeal, that they did not do so, and further argued that he would have appealed, but for their alleged deficiencies, the Court concluded that Blancas had stated a facially valid claim of ineffective assistance, the merit of which could not be resolved on the record then before it.[60] Accordingly, the Court convened an evidentiary hearing pursuant to Rule 8(a) of the Rules Governing Section 2255 Proceedings, for the limited purposes of determining whether: (1) counsel consulted with Blancas about an appeal; (2) Blancas expressly requested counsel to file a notice of appeal or reasonably demonstrated to counsel that he was interested in appealing; and (3) there were a reasonable probability that, but for counsel's deficient performance (if any), Blancas would have timely appealed.[61]

The Court noted that, if it determined Blancas had failed to show his attorneys'

---

56. *See id.*

57. *See Roe v. Flores–Ortega*, 528 U.S. 470, 120 S.Ct. 1029, 145 L.Ed.2d 985 (2000) (stating that a lawyer who disregards specific instructions from the defendant to file a notice of appeal acts in a manner that is professionally unreasonable and that to satisfy the prejudice prong of *Strickland*, the defendant is not required to show that he had nonfrivolous grounds on which to appeal, but only that but for counsel's purported errors, he would have appealed).

58. *See* Order, dated August 10,2004, Docket no. 185, pp. 3–4.

59. *See id; see also United States v. Zuniga–Salinas*, 945 F.2d 1302, 1306 n. 1 (5th Cir. 1991) (finding that district court correctly dismissed collateral attack on conviction pending the outcome of defendant's direct appeal); *Fassler v. United States*, 858 F.2d 1016, 1019 (5th Cir.1988) (a criminal defendant may not collaterally attack his conviction until it has been affirmed on direct appeal); *Jones v. United States*, 453 F.2d 351, 352 (5th Cir. 1972) (a criminal defendant may not collaterally attack his conviction until it has been affirmed on direct appeal); *United States v. Odiodio*, No. 3–99–CR–236–D(02), 2002 U.S. Dist. LEXIS 3030, *3 n. 2 (N.D.Tex.2002) (a district court may not adjudicate the merits of a section 2255 motion while a direct appeal is pending); *United States v. Woodson*, No. 94–CR–266, 1997 WL 399597, *1, 1997 U.S. Dist. LEXIS 10549, *3 (E.D.La.1997) (a criminal defendant may not collaterally attack his conviction until it has been affirmed on direct appeal).

60. *See* Order, dated August 10, 2004, Docket no. 185, p. 4.

61. *See Flores–Ortega*, 528 U.S. at 482–83, 120 S.Ct. at 1037.

ineffective assistance denied him his right to appeal, it would then be necessary to address his other allegations of ineffective assistance.[62] The Court therefore advised the parties that it would also take evidence to determine whether counsel told Blancas that he would face the death penalty if he proceeded to trial, that a jury had already been picked, and that one juror had previously been held hostage.[63]

## B. The Hearing

The Court conducted the evidentiary hearing on September 22, 2004. Blancas, who was represented at the hearing by Court-appointed counsel, neither testified nor introduced any direct or circumstantial evidence to support his claim of ineffective assistance. The Government, in contrast, called both Abraham and Smith, the attorneys who represented Blancas during the criminal prosecution that is the subject of his instant Motion to Vacate.

### 1. Testimony of Kathleen Salome Smith

Smith testified first and identified Blancas as the individual who had been her client.[64] On direct examination, she related that she had approximately 15 years' experience as a state and federal criminal defense attorney and that she had worked for Abraham when Blancas retained his services. Smith explained that she entered an initial appearance as a representative of the firm and that Abraham and she worked together on Blancas' case. Although Abraham was lead counsel, Smith stated that she had more personal contact with Blancas. She explained that Abra-

ham also met with Blancas, but that during the course of the representation, she would most often contact Blancas, while Abraham would communicate with Blancas' family and the Government.

Smith remembered the Indictment under which Blancas had been arrested in October 2000, recalling that it contained about 17 counts. Those counts, she said, involved drug trafficking and hostage taking. Smith further recalled receiving discovery material from the Government, in the form of audiotapes. The Government contended that one of the voices on the tapes belonged to Blancas. It further argued that, as well as capturing other incriminating statements, the tapes recorded Blancas ordering the deaths of the Sahagun brothers, whom Blancas had earlier arranged to be taken hostage.

The initial appearance was the first occasion on which she met with Blancas. Thereafter, Smith said, she met with Blancas once every couple of weeks while he was held at the El Paso County Jail Annex, sometimes more frequently and sometimes less frequently, depending upon the evidence that had come to light in the case. For example, she explained, there was a period during which the case was stayed while the Government sought permission from the Office of the Attorney General in Washington, D.C., to seek the death penalty against Blancas. During that time, she saw Blancas less frequently.

Smith recalled that, during the pendency of the case, Blancas was transferred for a time to the Doña Ana County Detention Facility in Las Cruces, New Mexico.

62. *See* Order, dated August 10, 2004, Docket no. 185, p. 4.

63. *See id.*

64. Blancas' counsel (for purposes of the evidentiary hearing only), Luis Islas, invoked the

Rule of Witnesses, and thus Abraham was not present when Smith testified. Because the Government indicated that it did not intend to recall Smith to the stand, Islas did not object to Smith remaining in the courtroom while Abraham testified.

Smith stated that she continued to visit Blancas at this more distant facility and also communicated with him by telephone. Blancas, she said, would call collect from the jail. The call would be passed to the individual for whom he was asking, if that person were there, and if not, to an individual who was then present. Smith stated that Blancas had several conversations with and grew very close to her secretary, Ruth Medina ("Medina"). Smith further testified that she (*i.e.,* Smith) and another individual in the firm, Richard Esper, spoke frequently with Blancas over the telephone.

Smith related that Blancas had an opportunity to review the Government's. evidence against him. As part of that review, Blancas listened to the audiotapes. Some of the tapes were played for Blancas at the El Paso County Detention Facility. Thereafter, Blancas would call the firm and request that specific tapes be played for him over the telephone. On her end, Medina would put the call on the speaker phone, insert the desired tape into the firm's tape recorder, and play it for Blancas, who would then listen to it over the telephone.

Smith testified that Abraham retained the services of a voice analyst in Dallas, Texas. The analyst required a sample of Blancas's voice to compare with the voice on the audiotapes. Because Blancas was not allowed to call the analyst directly in Dallas from the El Paso County Detention Facility, Abraham and Smith arranged a conference call. Blancas called the firm's offices and then the firm called the analyst in Dallas. The analyst interviewed Blancas to obtain a pattern of his vocal inflections. After comparing the sample taken from Blancas against the voice on the audiotapes, the analyst concluded that the voice on the tape did not belong to Blancas.

Abraham and Smith communicated the analyst's conclusion to Joseph W. Galenski ("Galenski"), the Assistant United States Attorney assigned to the case, and sent him a copy of the analyst's report. Galenski responded by letter, stating that the informant who had identified the voice on the tape as belonging to Blancas had subsequently recanted. Galenski, however, informed them that the Government had since come to possess other, different tapes, on which Blancas could be heard speaking. Galenski also told them that, despite the additional tapes, he did not plan to use any audio tapes if the case went to trial. Instead, he indicated that he would rely on live testimony by informants and cooperating witnesses.

Smith testified that she and Abraham determined that if Blancas had gone to trial and been found guilty, he would have been facing an automatic life sentence. She stated that initially, before the Government re-indicted Blancas on Counts Eighteen, Nineteen, and Twenty, they believed he had a defensible case. For example, she and Abraham felt that the voice analyst's report, which concluded that the voice on the tape did not belong to Blancas, significantly weakened the Government's case against him. They accordingly advised Blancas to reject the Government's initial plea offer of a 30–year sentence in return for a guilty plea. Smith also testified, however, that they offered Blancas no guarantees that he would be acquitted if they proceeded to trial.

Although they still felt that they had a defensible case, Smith explained that the Government injected a countervailing consideration into this calculus when it sought approval from the Office of the Attorney General to pursue the death penalty, based on the charges contained in the Second Superseding Indictment. Smith stated

that they prepared a letter opposing the death penalty and submitted it to the Office of the Attorney General. She said that the detailed Blancas' life and education. The letter moreover discussed the merits of the charges against Blancas, emphasizing that the Sahagun brothers' bodies had not been found. Smith further testified that the September 11, 2001 attacks against the World Trade Center occurred while the request was pending. The resulting disruption, she explained, caused the Government to abandon its request for the death penalty and that request was later formally denied by the Office of the Attorney General.

Smith recalled that the complexion of the case changed even more dramatically upon the Grand Jury's return of a Fourth Superseding Indictment, which included three new counts: witness-tampering, murder-for-hire, and conspiring to cause another to travel in foreign commerce with the intent that a murder be committed (Counts Eighteen, Nineteen, and Twenty). Based on the discovery material given to them,[65] she and Abraham concluded that they had no defense to the three new counts. Moreover, they felt that the evidence the Government would present in support of Counts Eighteen, Nineteen, and Twenty would inevitably lead a jury to convict Blancas on Counts One through Seventeen.

Smith testified that they attempted to sever Counts Eighteen, Nineteen, and Twenty from Counts One through Seventeen. They believed that, if they could sever the later counts, they could still defend Blancas against Counts One through Seventeen. The Court, however, denied their Motion to Sever the counts.

Smith said that she and Abraham believed the Government would likely renew its request for the death penalty, in light of the new allegations and evidence against Blancas. Using the length of time it took to process the Government's first request for permission to seek the death penalty as a yardstick, they estimated it would take the Office of the Attorney General approximately eight or nine months to process another such request. They consequently made a tactical decision to secure a trial date as quickly as possible, in hopes that the Government would not have time to have its request processed if it sought the death penalty a second time. Accordingly, Abraham instructed Smith to ask for a trial date at the next docket call. Smith stated that she did so and was able to obtain a trial date for sometime in August 2002. By obtaining the August trial date, Smith said, she and Abraham felt they had successfully foreclosed the possibility that Blancas might face the death penalty if he went to trial and were convicted. The worst-case scenario would have been a conviction and automatic life sentence.

Smith recalled that, around this time, Abraham engaged in plea negotiations with the Government. To her knowledge, the Government had withdrawn its earlier 30–year offer after the Grand Jury returned the Fourth Superseding Indictment. Abraham attempted to negotiate a 20–year sentence, but the Office of the United States Attorney for the Western District of Texas, headquartered in San Antonio, would not approve the deal. That Office did, however, eventually approve a 25–year term of imprisonment.

Smith stated that they were on the eve of trial when this approval came. She and Abraham communicated the terms of the

**65.** The Government based its new allegations on tape recorded conversations Blancas had with a cell mate while in detention awaiting trial in this cause. *See supra* text accompanying note 3.

agreement to Blancas, who was then confined in the El Paso County Detention Facility. According to Smith, they explained to Blancas that, if he accepted the offer, he would receive a 25–year term of confinement. They moreover explained the rights Blancas must waive to receive the benefit of the bargain. Regarding his right to appeal, Smith testified that they discussed the subject in detail. They told Blancas that he could appeal on only three grounds: (1) prosecutorial misconduct; (2) ineffective assistance of counsel; or (3) a change in the law that was held to be retroactive and applicable to his case. Smith recalled that she promised not to forget about him and to let him know if there were a change in the law so that he could seek a reduction in his sentence.

Smith testified that it was Blancas' decision to accept the plea bargain. She spoke to him in English and in Spanish, and he would sometimes reply in English and sometimes in Spanish. Smith stated that Blancas was a very intelligent person, and as far as she could tell, understood the terms of the plea agreement. She and Abraham were present at a family meeting held at the jail that evening. During the meeting, Blancas told his family that he was going to accept the Government's plea offer and explained his reasons for doing so. Smith could not remember whether Blancas signed the plea agreement that day or in court on the day of the plea hearing. She did recall that she saw Blancas only briefly on the morning of the plea hearing and that Abraham spent the most time with Blancas on that particular day.

Smith remembered she and Abraham discussed the prisoner treaty program with Blancas either in the same discussion about the plea agreement or very soon thereafter. When they did discuss it, she explained to Blancas that it was not really a viable or likely option, but also explained that he would have been categorically ineligible for prisoner exchange if he had gone to trial and been sentenced to life in prison. She emphasized to him that their focus was avoiding a life sentence, and that the remote possibility of qualifying for a prisoner exchange with Mexico should, at most, factor neutrally in his decision whether to accept the plea offer.

Smith testified that a jury was never chosen in the case, although she and Abraham had a list of potential jurors and had reviewed it. She said that the list included names and addresses and not much more. She could not recall whether the occupations were listed. The Court took judicial notice of the fact that occupations were included on the list, as were spouse's occupations. Smith stated that she never spoke to anyone on the list, nor did she have personal knowledge regarding anyone on it.

Smith described Blancas' emotional state following the plea and sentencing as sad, but glad to have the matter behind him. He looked at it, she said, in terms of one day getting out and promised to take her to dinner when he did. Smith testified that Blancas expressed no desire to appeal his case to her on the day of the plea. She further stated that she received no communication from Blancas on or before August 20, 2002 (*i.e.*, the last day to file a timely Notice of Appeal) regarding a desire to appeal. She said that she visited him at the El Paso County Detention Facility before he was transferred to the United States Penitentiary in Beaumont, Texas ("USP–Beaumont"), and he did not then express any desire to appeal. Smith could not remember exactly when Blancas was transferred to USP–Beaumont, except that it seemed to happen fairly quickly after sentencing. She said that she received both telephone calls and letters from Blancas after he was transferred to

USP–Beaumont. During those telephone calls, he did not express a desire to appeal. Smith stated that the written communications from Blancas were both legal and personal in nature—for example, Christmas greetings to her and to her secretary, Ruth Medina. She testified that Blancas never expressed any dissatisfaction with their representation in any of his communications.

During her direct examination, Smith lastly testified that she and Abraham negotiated a companion agreement with the Government that might benefit Blancas. Luis Fernando Blancas, Movant's brother and co-defendant, Smith explained, was then being held in Mexico City and facing extradition. The substance of the agreement was that, if Luis Fernando Blancas agreed to waive extradition, the Government would file a Rule 35 motion for a 5–year reduction in Blancas' sentence based on substantial assistance in the prosecution of another. Galenski provided them with a letter memorializing the agreement.

On cross-examination, Blancas' counsel elicited the following testimony from Smith. Blancas entered his guilty plea a couple of days before the trial was set to begin. Smith believed that he had entered the plea on the Thursday before the trial was to begin on the following Monday. The Government had not yet received authorization to seek the death penalty, she said, so that if Blancas went to trial, he would not have been facing the death penalty. Smith testified that they had discussed the possibility of the death penalty with Blancas immediately after he was indicted on Counts Eighteen, Nineteen, and Twenty. By the time Blancas entered the plea agreement, however, they all knew that the death penalty was not a possibility.

Smith estimated that she and Abraham met with Blancas at the jail for two to two-and-a-half hours to discuss the plea agreement. It was not strictly speaking a contact visit, she said. Smith explained that, in light of the new counts brought against him in the Fourth Superseding Indictment, Blancas had been reclassified as a greater security risk. He was therefore separated from them by a glass panel and they spoke to him on a telephone line. She recalled that Blancas had a copy of the plea agreement on his side of the glass. She reiterated her testimony on direct-examination, to the effect that Blancas had asked about the prisoner exchange program and that they had advised him that they thought it would not happen. Blancas, she explained, possessed dual citizenship in Mexico and the United States. They advised him that, in the unlikely event he were ever approved for such an exchange, he would be required to renounce his United States citizenship before he could take advantage of it.

Blancas' counsel asked Smith whether she or Abraham told Blancas that they would ask the Court to recommend Blancas for a drug treatment program. Smith answered that Abraham did indeed tell Blancas this. Smith agreed that successfully completing a drug treatment program could take a year off an individual's sentence. She testified, however, that she and Abraham told Blancas they were not sure he would be allowed to participate in a drug treatment program, since there would be no Presentence Report prepared, but would request it just in case. Smith also stated that they advised Blancas about other adverse consequences of accepting the plea, such as the fact that he would be placed in a maximum security facility. They told him that they would request USP–Beaumont, but warned him that he might be sent to Leavenworth and "they were going to be pretty tough on him."

Smith agreed that Blancas entered his guilty plea very soon after she and Abraham presented the Government's plea offer to him. She estimated that Blancas probably had about a day to decide whether to accept or reject the agreement. She also agreed with Blancas' counsel that it was a complex case and a complex plea agreement, but stated that it was actually less lengthy than most plea agreements she had worked out in less-complicated cases.

During the plea discussion, Smith testified, Abraham spoke in English, while she probably spoke with Blancas in both English and Spanish. Smith clarified that she did not act as an interpreter between Blancas and Abraham, because Blancas was fluent in English. She stated they told Blancas that, if he accepted the plea agreement, he would enter his guilty plea and then be sentenced immediately afterwards. She said that she and Abraham were both extremely concerned about the Court seeing a Presentence Report in Blancas' case, due to the severity of the allegations. They purposely sought to avoid the preparation of a Presentence Report, she recalled, and therefore requested immediate sentencing. Smith agreed with Blancas' counsel that the plea agreement did not reflect the request for immediate sentencing.

Smith elaborated on her post-sentencing contact with Blancas. When they met at the jail after sentencing, she remembered, Blancas expressed a general wish that his sentence could be less, and asked her to do whatever they could to that end. Smith said that she then told Blancas about the second agreement she and Abraham were attempting to negotiate with the Government, which could possibly reduce his term of imprisonment. Smith explained that she and Abraham thought Blancas' brother Luis was going to be extradited to the United States no matter what and so it would not harm him to waive extradition. Their strategy, she said, was to act as though Luis Fernando Blancas really did not want to waive extradition and then give the credit to Blancas when he did. She also testified that the only way the Government would move to reduce Blancas' sentence by a significant amount was if Blancas were to reveal the location of the Sahagun brothers' bodies. Smith stated that the Government had repeated that offer even as recently as a couple of weeks before the instant evidentiary hearing. She acknowledged that Abraham had a reputation for not continuing to represent a client who opted, during the course of representation, to cooperate with the Government. She said that in those situations, the client would be asked to seek other counsel.

When asked if she talked to Blancas within 30 days of the plea and sentencing, other than during the in-person visit she described, Smith answered that she probably had, because he called the office collect almost every single day. She assumed there would be telephone records to corroborate that collect calls were placed from the El Paso County Detention Facility, but noted that the firm had many clients and the telephone records would not reflect the specific tank from which the call had been placed. When asked whether she had an independent recollection of talking to Blancas within 30 days after the plea and sentence, she answered that they continued talking well past the time he was transferred to USP–Beaumont. Smith recalled that she received a few "very routine" telephone calls from Blancas. Later, she said, she received more calls from him regarding certain issues at USP–Beaumont.

On re-direct examination, Smith confirmed that she advised Blancas of the plea

agreement's terms and that he would be sentenced during the same hearing. She also testified that she advised him of the consequences of not having a Presentence Report prepared. She lastly recalled that, after Blancas was transferred to Beaumont, he requested a transcript of the plea and sentencing hearing, which they provided.

### 2. Testimony of Joseph "Sib" Abraham

Abraham testified that he had 43 years' experience, primarily as a criminal defense lawyer. He identified Blancas and stated that he had been hired to represent him sometime around October 2000. Abraham recalled that Blancas has been indicted on a 17–count Indictment and that he hired a voice analyst to help defend Blancas against the charges. The voice analyst's report was favorable to Blancas' case, Abraham remembered. Abraham said that he conveyed the voice analyst's opinion to the Government, as he was required to do.

Abraham thought they had a defensible case, and communicated his assessment to Blancas. He told Blancas that they had the voice analyst's opinion, concluding that Blancas' voice was not the same voice recorded on the Government's tapes. Moreover, Blancas' mother, his aunt, and his wife would also testify that the voice on the tapes did not belong to him. Abraham also advised Blancas that his sentence would be "horrendous" if they lost. Abraham estimated that the offense level would have been 43, which meant a life sentence, but noted that life imprisonment was a less severe punishment than the death penalty, which the Government had at one point sought. He said that his firm prepared a substantial letter to the Attorney General requesting that permission to seek the death penalty be denied. They subsequently received information that the Gov-

ernment had abandoned its attempt to seek the death penalty.

Like Smith, Abraham remembered that his assessment of the case changed dramatically, when, around March 2002, the Government re-indicted Blancas, adding Counts Eighteen, Nineteen, and Twenty. When the Fourth Superseding Indictment was returned against Blancas, Abraham stated, he felt that they were going to have a lot of trouble defending him. Abraham explained that the Government had tapes of Blancas and a confidential informant discussing "many, many things that were to the liability to Mr. Blancas." He and Smith filed a Motion to Suppress, Abraham stated, and were successful in suppressing the parts of the taped conversations that pertained to Counts One through Seventeen. They then met with the Government to negotiate redactions to the portions of the audiotape transcripts that the Court had not deemed inadmissible. They were able to agree on all but three or four redactions, and presented them to the Court to resolve.

Abraham recalled that he grew very concerned after the last three counts were added, believing that the Government would again request permission to seek the death penalty. Abraham concluded that the allegations that Blancas had ordered the Sahagun brothers taken hostage and then killed, combined with the Government's evidence allegedly showing him attempting murder the witnesses who were to testify against him at trial, would prompt the Government to renew its pursuit of the death penalty.

Abraham related that, before Counts Eighteen, Nineteen, and Twenty were brought against Blancas, the Government had made a plea offer of 30 years. At that point, Abraham stated, because they still believed Blancas had a defensible case, they rejected the offer. By the time of the

Fourth Superseding Indictment, that offer had been taken off the table.

Abraham was unable to recall exactly when he entered into the negotiations which ultimately led to Blancas' guilty plea. He remembered that he wanted to obtain a trial setting as soon as possible to prevent the Government from obtaining approval for the death penalty in time for trial. Abraham stated that he therefore instructed Smith to ask for a trial date at the next docket call to head off any renewed attempt by the Government to seek the death penalty. At docket call, the Court set the trial for sometime in August 2002.

Abraham recalled that, regarding plea negotiations with Galenski, he asked for a 15–year sentence. They eventually began to discuss the possibility of a 20–year sentence, but Galenski was unable to get approval from San Antonio. The least severe sentence that San Antonio would approve was a 25–year sentence. The San Antonio office, however, indicated that it would approve a 20–year sentence if Blancas' brother, Luis, would waive extradition and return willingly to the United States. Abraham testified that he had Galenski memorialize the companion agreement in a letter, but agreed that the plea agreement Blancas signed did not discuss it. Abraham did not recall either himself or the Government bringing the companion agreement to the Court's attention.

Abraham remembered the meeting in which he explained the terms of the agreement to Blancas, and that it was Blancas' decision to accept the plea. Abraham stated that he discussed the fact that Blancas would be waiving his appeal rights, except for ineffective assistance of counsel or prosecutorial misconduct, and that the plea

agreement itself also discussed that waiver. He could not recall whether he gave Blancas a copy of the plea agreement, but did remember telling Blancas that he would be sentenced at the same hearing in which he pleaded guilty and that they would waive the preparation of a Presentence Report. Abraham testified that he told Blancas the advantages of not having a Presentence Report prepared clearly outweighed any downside that might result from not having one. The downside, he told Blancas, would be his ineligibility for a 500–hour alcohol treatment program.[66] Moreover, without background information to accurately assess Blancas' threat level, the Bureau of Prisons would subject him to less favorable conditions of confinement than it might otherwise impose.

Abraham did not recall how long the meeting lasted, except that they met with Blancas and then with Blancas and his family. He could not remember whether or not he had any communication with Blancas in El Paso or over the telephone before Blancas was transferred to USP–Beaumont. He may have, he said, but simply could not recall. Abraham stated that he could absolutely not recall any conversation with Blancas, in which Blancas asked him to file a Notice of Appeal. Abraham testified that there was no point between the plea and the instant evidentiary hearing at which Blancas expressed a desire to appeal his case, and that, in any event, there was no basis for an appeal.

Abraham stated that he and his office filed a number of motions of Blancas' behalf, from motions concerning discovery to motions concerning his and Smith's ability to visit Blancas in Las Cruces when the U.S. Marshals moved him to the Doña Ana County Detention Facility. Abraham ex-

66. If Blancas had been eligible for and successfully completed such a treatment program, he would have been entitled to a one-year reduction in his sentence.

plained that he was a close friend of the Blancas family and accordingly mobilized his entire office to represent Marco Antonio Blancas.[67]

When asked about jury selection in the case, Abraham testified that a jury was never selected and that Blancas' presence would have been necessary if one had been picked. Abraham further stated that he never told Blancas that a member of the jury had been a hostage. Regarding the prisoner exchange program, Abraham testified that he may have discussed it with Blancas, but did not remember doing so.

On cross-examination, Blancas' counsel asked Abraham what language he and Smith spoke with Blancas during their meeting. Abraham replied that they probably spoke both English and Spanish, and recalled that Blancas would speak to them in both languages. Abraham agreed that the meeting they had with Blancas concerning the plea agreement occurred within roughly 24 hours of Blancas entering his guilty plea. Abraham stated that Blancas, himself, and Smith were present at the meeting. He could not remember if the family had been present when they first discussed the plea agreement. Abraham had no independent recollection regarding exactly where the meeting had occurred or where the plea agreement was signed, but felt certain it had to have been at the El Paso County Jail.

Abraham was then given an opportunity to review a copy of the plea agreement. When asked if he had read the agreement to Blancas, Abraham could not recall whether he read it word for word, but did remember that they explained it to him. Abraham testified that the plea agreement did not seem complicated to him, and that, in any event, what he tried to do for Blancas, as for all his clients, was to put

the agreement into terms he would understand. Blancas' counsel directed Abraham's attention to language on the first page of the plea agreement, which stated that Blancas would be sentenced to 300 months under Rule 11(e)(1)(C), and then to language on the second page of the agreement, which stated that Blancas was aware that his sentence would be imposed in conformity with the guidelines. Abraham disagreed with counsel's assertion that the two passages necessarily conflicted. When asked whether he thought a layperson would have been confused about what provision would govern his sentencing, Abraham replied that the agreement was straightforward. Blancas was going to get a 300–month sentence and the length of the sentence was the important thing to Blancas and to himself.

Abraham testified that he and Smith did not mention the death penalty when they discussed the plea agreement, because they were then on the eve of trial and the Government had not renewed its attempt to seek that extreme sanction. The maximum sentence Blancas could have received, if convicted, therefore, was a life sentence. Abraham emphasized that a life sentence in the federal system is indeed a life sentence. There is no possibility of parole. Although Abraham agreed with counsel that 300 months is a long time, he further testified that Blancas understood the difference between serving 25 years and risking the very likely possibility of never getting out at all, if he proceeded to trial with a very weak defense.

When asked about their discussion of Blancas' appeal rights, Abraham stated that he told Blancas he was not entitled to appeal, under the terms of the agreement, and that there really would be no basis for

---

**67.** At the evidentiary hearing, the Court took judicial notice of the 24 motions, some with memoranda of law, that Abraham and Smith filed on Blancas' behalf.

an appeal. Abraham agreed with counsel that a defendant has the right to file even a frivolous appeal. Abraham also agreed that if, after sentencing, Blancas had stated that he wanted to appeal, it would have been his duty to talk with Blancas about the benefits of it and the restrictions placed on his right to appeal by the terms of the plea agreement. Abraham testified that he would have told Blancas that there was no basis to appeal.

Abraham remembered having a brief conversation with Blancas in the courtroom, immediately after sentencing. He said it was very emotional; they hugged and he wished Blancas the best of luck. Abraham agreed that Blancas could not be described as glad to get 25 years, but stated that he had never met anyone who would be happy at such a prospect. Abraham said that Blancas may have called him later, but he did not remember Blancas doing so. He did not recall talking with Blancas personally within 30 days of sentencing. Regarding the frequency of his contact with Blancas during the course of his two-year representation, Abraham said that he met with Blancas personally, but could not say how many times.

There was no redirect examination by the Government and it waived argument. Blancas' counsel argued that Smith and Abraham did not clearly establish that they went back to the jail within the 10–day or 30–day period to talk about Blancas' right to appeal. Counsel emphasized that whether Blancas had been denied the right to appeal was separate question from whether such an appeal would have been frivolous and urged the Court to restore Blancas' right to file a direct appeal.

## III. *LEGAL STANDARD*

After a defendant has been convicted and exhausted or waived any right to appeal, a court is normally "entitled to presume that [he] stands fairly and finally convicted." [68] Accordingly, "relief under 28 U.S.C. §§ 2255 is reserved for transgressions of constitutional rights and for a narrow range of injuries that could not have been raised on direct appeal and would, if condoned, result in a complete miscarriage of justice." [69] A criminal defendant seeking relief from his conviction or sentence in a Motion to Vacate pursuant to 28 U.S.C. § 2255 must therefore establish one of the following: (1) his sentence was imposed in violation of the Constitution or laws of the United States; (2) the sentencing court lacked jurisdiction to impose the sentence; (3) the sentence imposed exceeded the maximum authorized by law; or (4) the sentence is otherwise subject to collateral attack.[70]

Moreover, "when raising issues of jurisdictional or constitutional magnitude for the first time on collateral review, a defendant ordinarily must show both cause for his procedural default and actual prejudice resulting from the error." [71] This cause-and-actual-prejudice standard is "significantly more rigorous than even the plain error standard applied on direct appeal." [72] The procedural bar does not apply, however, to claims which could not

68. *United States v. Willis*, 273 F.3d 592, 595 (5th Cir.2001) (citing *United States v. Frady*, 456 U.S. 152, 164, 102 S.Ct. 1584, 1592, 71 L.Ed.2d 816 (1982); *United States v. Shaid*, 937 F.2d 228, 231–31 (5th Cir.1991)).

69. *United States v. Gaudet*, 81 F.3d 585, 589 (5th Cir.1996) (internal quotations and citations omitted).

70. *See United States v. Seyfert*, 67 F.3d 544, 546 (5th Cir.1995) (citations omitted).

71. *Gaudet,* 81 F.3d at 589.

72. *Id.*

have been raised on direct appeal, such as those alleging ineffective assistance of counsel.

## IV. *THE MERITS OF BLANCAS' CLAIMS*

Blancas' claims, as he presents them, are a tangle of intertwined allegations. After reading his claims in conjunction with his accompanying Memorandum of Law, the Court understands him to argue, at heart, the following: (1) the Court lacked subject matter jurisdiction, because the crime, if any, occurred in Mexico rather than the United States; (2) venue was improper; (3) he was denied due process and fair sentencing when the court sentenced him without the benefit of a Presentence Report; (4) the facts offered by the Government to support his guilty plea were exaggerated or untrue; (5) his plea and concomitant waiver of appellate rights were involuntary due to inadequacies in the Court's plea colloquy and the absence of an interpreter; (6) his plea and waiver of appellate rights were involuntary due to his attorneys' deliberate misrepresentations and false promises;[73] (7) his attorneys rendered ineffective assistance because they were disorganized and unprepared for trial, allowed a jury to be picked outside Blancas' presence, failed to move to suppress evidence against him gathered by a jailhouse informant, and did not sufficiently explain the rights he would be giving up if he pleaded guilty; and (8) his attorneys also rendered ineffective assistance by failing to file a notice of appeal for him after he asked them to do so. Blancas states that he did not previously raise any of his instant claims because his attorneys told him that he could not, because he had waived his right to appeal.

■■■ Before proceeding further, the Court will pause to consider the effect of Blancas' guilty plea and plea agreement on his present claims. It is well-established that criminal defendants have only a limited ability to challenge a conviction entered pursuant to a guilty plea:

[A] guilty plea represents a break in the chain of events which has preceded it in the criminal process. When a criminal defendant has solemnly admitted in open court that he is in fact guilty of the offense with which he is charged, he may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea. He may only attack the voluntary and intelligent character of the guilty plea by showing that the advice he received from counsel was not within the standards set forth in *McMann [v. Richardson,* 397 U.S. 759, 770, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970) ].[74]

Although a criminal defendant, such as Blancas, who pleads guilty may challenge jurisdictional defects which dispute "the very power of the State to bring the defendant into court to answer the charge

---

**73.** In his Motion to Vacate, Blancas names only Smith as the attorney who represented him. *See Movant's Mot. to Vacate,* Docket no. 159, p. 5. It is clear from the record and testimony at the evidentiary hearing held on September 22, 2004, however, that Abraham was hired as Blancas' lead counsel and that Smith functioned as the junior attorney on the case. In Blancas' Memorandum submitted in connection with his Motion to Vacate,

moreover, he appears to direct the majority of his criticism against Abraham. In an abundance of caution, the Court will treat Blancas' allegations of ineffective assistance as though they are brought against both Abraham and Smith.

**74.** *Tollett v. Henderson,* 411 U.S. 258, 267, 93 S.Ct. 1602, 1608, 36 L.Ed.2d 235, 243 (1973).

against him," [75] he waives his right to challenge all non-jurisdictional defects preceding the plea.[76]

■ Moreover, in accepting the plea agreement, Blancas specifically agreed to waive his right to contest or collaterally attack his sentence by means of any post-conviction proceeding under 28 U.S.C. § 2255, except on the basis of prosecutorial misconduct or ineffective assistance of counsel. It is well-settled that an informed and voluntary waiver of post-conviction relief under 28 U.S.C. § 2255 "is effective to bar such relief." [77] However, the Fifth Circuit has held that a waiver of appeal may not be enforced against a defendant who raises a challenge in a § 2255 Motion who claims that ineffective assistance of counsel rendered the waiver itself involuntary.[78] Nonetheless, unless the alleged ineffective assistance of counsel "directly affected" the validity of the waiver or the plea itself, the claim for ineffective assistance of counsel is waived.[79]

■ With these principles in mind, the Court concludes that Blancas' guilty plea and the express terms of his plea agreement foreclose review of all but three of his eight claims. The guilty plea does not foreclose review of his claim that his plea was involuntary due to his attorneys' misrepresentations, nor does it foreclose review of his ineffective assistance claims, as the terms of the plea agreement specifically excepted such challenges. The guilty plea similarly does not foreclose review of his challenge to the Court's subject-matter jurisdiction. In contrast, his guilty plea bars review of his remaining claims, all of which allege non-jurisdictional error.[80]

*A. The Court lacked subject matter jurisdiction because the crime, if any, did not occur in the United States.*

■ The Court understands Blancas to argue that, because Santiago Sahagun's abduction occurred in Mexico, if it occurred at all, this Court had no jurisdiction. Blancas' claim has no merit. Title 18 U.S.C. § 3231 confers original jurisdiction in the district courts over all offenses against the United States.[81] Further, there is no constitutional bar to the extraterritorial application of penal laws.[82]

Title 18 U.S.C. § 1203, which defines the offense of hostage taking, expressly contemplates criminal activity occurring outside the United States. That section provides, in pertinent part:

§ 1203. Hostage taking

(a) Except as provided in subsection (b) of this section, whoever, *whether inside or outside the United States*, seizes or

**75.** *Blackledge v. Perry*, 417 U.S. 21, 30, 94 S.Ct. 2098, 2103, 40 L.Ed.2d 628, 636 (1974).

**76.** *See United States v. Owens*, 996 F.2d 59, 60 (5th Cir.1993) (per curiam).

**77.** *United States v. Wilkes*, 20 F.3d 651, 653 (5th Cir.1994).

**78.** *See United States v. Henderson*, 72 F.3d 463, 465 (5th Cir.1995).

**79.** *United States v. White*, 307 F.3d 336, 343 (5th Cir.2002).

**80.** Blancas' claim that venue was improper does not raise a jurisdictional challenge. *See Horton v. Bank One, N.A.*, 387 F.3d 426, 433 (5th Cir.2004) (noting that venue is distinct from jurisdiction); *Driscoll v. New Orleans, S.B. Co.*, 633 F.2d 1158, 1159 n. 1 (5th Cir. 1981) (stating that venue is distinct from jurisdiction and venue may be proper or improper, independent of subject matter or personal jurisdiction).

**81.** *See* 18 U.S.C.A. § 3231 (West 2004).

**82.** *See Chua Han Mow v. United States*, 730 F.2d 1308 (9th Cir.1984), *cert. denied*, 470 U.S. 1031, 105 S.Ct. 1403, 84 L.Ed.2d 790 (1985).

detains and threatens to kill, to injure, or to continue to detain another person in order to compel a third person or a governmental organization to do or abstain from doing any act as an explicit or implicit condition for the release of the person detained, or attempts or conspires to do so, shall be punished by death or life imprisonment.

(b)

(1) It is not an offense under this section if the conduct required for the offense occurred outside the United States unless—

(A) the offender or the person seized or detained is a national of the United States;

(B) the offender is found in the United States; or

(C) the governmental organization sought to be compelled is the Government of the United States.[83]

The Information alleged that Blancas knowingly and intentionally seized, detained and threatened to continue to detain, injure and kill Santiago Sahagun in order to compel a third person, Special Agent Rene Medina, to pay a ransom for Sahagun's release. There is moreover no dispute that Blancas was arrested in El Paso, Texas and thus "found in the United States."[84] The Court therefore concludes that the facts to which Blancas pleaded guilty in open court provided a sufficient basis for exercise of federal jurisdiction.[85] Because his claim that the Court lacked subject matter jurisdiction lacks merit, relief is accordingly denied.

### B. Blancas's plea was involuntary due to his attorneys' deliberate misrepresentations.

Blancas claims that, to frighten him into accepting the plea agreement, Abraham and Smith deliberately and falsely represented that if he did not accept the Government's plea offer and proceeded to trial, he would face the death penalty. Moreover, he asserts, they told him that a jury had already been picked, that one of the jurors had previously been held hostage, and that he would absolutely be convicted if he proceeded to trial. As a further inducement, he argues, Abraham and Smith promised that he would be released to Mexico after he had served 7 or 8 years of his sentence. Blancas also alleges that they misrepresented the strength of the Government's case against him, telling him that the evidence compiled by the jailhouse informant was completely admissible, when it was actually, he contends, completely inadmissible.

### 1. Voluntary and intelligent guilty pleas

A guilty plea is constitutionally valid only to the extent it is voluntary and intelligent.[86] A plea does not qualify as voluntary and intelligent unless the defendant first: (1) was informed of the nature of the charges against him and all direct consequences of his plea; and (2) understood the constitutional rights that he was waiving by entering a guilty plea.[87]

---

83. 18 U.S.C.A. § 1203 (West 2004) (emphasis added).

84. See 18 U.S.C.A. § 1203(b)(1)(B).

85. See United States v. Palella, 846 F.2d 977 (5th Cir.1988).

86. See Bousley v. United States, 523 U.S. 614, 618, 118 S.Ct. 1604, 1609, 140 L.Ed.2d 828, 837 (1998) (quoting Brady v. United States, 397 U.S. 742, 748, 90 S.Ct. 1463, 1468–69, 25 L.Ed. 747, 756 (1970)).

87. See Brady v. United States, 397 U.S. at 754–55, 90 S.Ct. at 1472 (setting forth the constitutional standard for voluntary and intelligent pleas and holding that capital defendant's guilty plea in return for a life sentence,

Voluntariness is determined by examining all the relevant circumstances surrounding it.[88] Reviewing courts give great weight to the defendant's statements at the plea colloquy.[89] The Fifth Circuit Court of Appeals has held that a defense lawyer's stern warnings about the client's chances for success at trial, the potential for prison time, and the lawyer's potential withdrawal do not compromise voluntariness.[90]

### 2. Discussion

■■■ The Court credits the uncontradicted testimony of both Abraham and Smith at the evidentiary hearing, that they discussed the advantages and disadvantages of accepting the plea offer with Blancas (including the waiver of his appellate rights), recommended that he take the offer, and that it was Blancas who ultimately made an informed decision to plead guilty. It also credits their testimony that, when the three of them discussed the Government's 25–year plea offer, Blancas knew that the death penalty was not a possible punishment if he were to proceed to trial and the jury returned a guilty verdict.

It further credits their testimony that a jury was never picked in the case, as well as Abraham's testimony that he never told Blancas that a jury had been empaneled or that a member of the non-existent jury panel had been a hostage. The Court additionally credits Abraham and Smith's testimony that they discussed the possibility of prisoner exchange with Blancas, but expressed to him that it was an extremely remote possibility at best. The Court also finds that neither Abraham nor Smith misrepresented the strength of the Government's case to Blancas and that Blancas has failed to show that their advice to accept the plea agreement was unreasonable in light of all the circumstances.

The Court further concludes Blancas' claim that his plea was involuntary or unintelligent is neither supported by the record, nor consistent with the Court's independent recollection of the proceedings. The transcript of the plea hearing shows that the Court, through a certified interpreter who was present and translating for Blancas throughout the proceeding, specifically asked him whether he had a chance to review the one-count Information which accused him of hostage taking and whether he understood the nature of the charges in

when faced with the strong case against him and the possibility that he would receive the death penalty, was intelligently and voluntarily made); *Daniel v. Cockrell*, 283 F.3d 697, 702–3 (5th Cir.2002) (reciting the *Brady* standard for voluntary and intelligent pleas).

**88.** *See Brady*, 397 U.S. at 749, 90 S.Ct. at 1469.

**89.** *See Blackledge v. Allison*, 431 U.S. 63, 73, 97 S.Ct. 1621, 52 L.Ed.2d 136 (1977) (stating that solemn declarations in open court carry a strong presumption of veracity); *see also United States v. Cothran*, 302 F.3d 279, 283–84 (5th Cir.2002); *United States v. Martinez-Molina*, 64 F.3d 719 (1st Cir.1995) (crediting district court's determination, made during the plea colloquy, that the defendant had not been pressured, rather than the defendant's later self-serving statements); *United States v.*

*Abreo* 30 F.3d 29, 31 (5th Cir.1994) (placing great weight on defendant's statements during plea colloquy).

**90.** *See Cothran*, 302 F.3d at 284 (stating that, even if the defendant's attorney warned that he would almost certainly lose at trial and face a harsh sentence, these were warnings rather than threats); *Uresti v. Lynaugh*, 821 F.2d 1099, 1101–02 (5th Cir.1987) (finding plea voluntary where attorney warned client that he would be lucky to get 99 years if he went to trial and threatened to withdraw if client pleaded not guilty); *Jones v. Estelle*, 584 F.2d 687, 689–90 (5th Cir.1978) (holding that defense counsel's impatience and stern demand for an answer were not enough to make his guilty plea involuntary).

his case.[91] Blancas responded in the affirmative and further, in response to the Court's inquiry, denied that he was under the influence of illegal drugs, medication, or alcohol.[92] The Court then asked Blancas if he had understood everything that had transpired so far in the plea hearing and also whether he understood what else they would be doing during the hearing.[93] Blancas again answered in the affirmative.[94] The Court established that Blancas was 37 years old and a college graduate and determined that he was competent to enter a plea.[95]

The Court then informed Blancas of the rights that he would waive if he entered a plea of guilty: his right to a jury trial and to be found guilty beyond a reasonable doubt; his right to be presumed innocent and to an acquittal if the Government failed to prove him guilty beyond a reasonable doubt; his right to confront and question any witnesses brought forth by the Government; his right to offer evidence on his own behalf and to object to evidence offered by the Government; his right to remain silent; and his right for that silence not to be held against him.[96] When asked whether he understood his rights and was willing to waive them, Blancas again answered in the affirmative.[97]

The Court explained that Blancas was not at the plea hearing pursuant to the Grand Jury's previous Indictment, but rather, pursuant to an Information.[98] It informed Blancas that the Information had not been presented to the Grand Jury and if it were to be presented, the Grand Jury would have to decide whether or not to indict him.[99] The Court explained that if Blancas wished to proceed with the hearing, then he must sign a waiver.[100] Blancas duly signed the waiver in open court.[101] The Court then reviewed the contents of the waiver with Blancas.

> The Court: Mr. Blancas, the waiver that I have before me states that you have been advised of the nature of the charges against you, of your rights, and waive, in open court, prosecution by Indictment and consent that the proceedings may be by Information, and that you acknowledge that you have been given a copy of the Information before being called upon to complete.
>
> Now, did you, in fact, sign this waiver?
>
> Blancas: Yes, sir.
>
> The Court: And you wish to proceed today by Information?
>
> Blancas: Yes, sir.[102]

The Court then advised Blancas that if he entered a plea of guilty to hostage taking, the possible sentence that he could receive ranged from zero to a maximum of life imprisonment, plus supervised release of zero to 5 years, and a $100 assessment to the Crime Victims' Fund.[103] The Court asked Blancas:

91. *See* Plea Tr. at 2–3.

92. *See id.* at 4.

93. *See* Plea Tr. at 4.

94. *See id.*

95. *See id.*

96. *See id.* at 5–6.

97. *See id.* at 6.

98. *See id.*

99. *See id.* at 6–7.

100. *See id.* at 7.

101. *See* Plea Tr. at 7.

102. *See id.*

103. *See id.* at 8.

The Court: Now, do you understand what the maximum possible punishment can be if you enter your plea of guilty here today?

Blancas: Yes, sir.

The Court: Has anyone threatened, coerced, intimidated or in any way compelled you or forced you in any way to come here today to enter a plea of guilty, Mr. Blancas?

Blancas: No, sir.

The Court: Now, I have a plea agreement here before me, Mr. Blancas. I will need to go over this with you and I'm going to be asking you if this is, in fact, what you and the Government agreed to.

The plea agreement that I have here states that you, Marco Antonio Blancas, agree to plead guilty to an Information charging you with a violation of Title 18, United States Code, Section 1203, which is hostage taking. Did you, in fact, agree to that?

Blancas: Yes, sir.

The Court: In exchange, the parties agree that the sentence you should receive is 300 months custody of the Attorney General and further that if for some reason the Court will not accept the recommended sentence, then the plea agreement is null and void.[104]

The Court then asked the Government and the Government confirmed that, in addition, the Indictment then pending against Blancas would be dismissed at sentencing.[105] Blancas confirmed that this matched his understanding of what the Government had agreed to.[106] The Court continued:

The Court: The plea agreement further states that you waive your right to voluntarily and knowingly waive your right [*sic*] to appeal whatever sentence I do impose; however, you do retain your right to appeal if I were to depart upward to the sentencing Guidelines or if you were to believe that your sentence is a violation of your Constitutional rights based on claims of ineffective assistance of counsel or prosecutorial misconduct.

Now, Mr. Blancas, having gone over the plea agreement with you, have I correctly stated what you and the Government have agreed to?

Blancas: Yes, sir.[107]

The Court then confirmed with defense counsel that it had correctly stated the terms of the agreement, and continued its colloquy with Blancas:

The Court: I've gone over with you the promises made to you, Mr. Blancas. Has any other promise been made to you other than what I've gone over with you here today to induce you to plead guilty?

Blancas: No, sir. . . .

The Court: Do you understand that if the sentence is more severe than you expected, you will still be bound by your plea of guilty; however, it is my intention to accept the recommendation as stated in the plea agreement, but I have to admonish you on that. Do you understand that, Mr. Blancas?

Blancas: Yes, sir.

The Court: Do you understand that you or the Government may have the right to appeal whatever sentence I do impose; however, by the plea agreement

---

**104.** *See* Plea Tr. at 8–9.

**105.** *See id.* at 9.

**106.** *See id.*

**107.** Plea Tr. at 9–10.

that you've executed, you have substantially limited your rights to file an appeal.

Do you understand that?

Blancas: Yes, sir.[108]

The Court again asked Blancas:

The Court: [O]ther than the information provided by your attorneys on the Sentencing Guidelines has anyone made any prophecy or promise to you of what sentence I'm going to give you, and again, other than what's in the plea agreement also?

Blancas: No, sir.

The Court: Mr. Blancas, if you were to proceed to trial on the single-count Information, for you to be convicted of having taken a hostage, the Government would be obligated to prove beyond a reasonable doubt that you did knowingly and intentionally seize, detain and threaten to continue to detain, injure and kill Santiago Sahagun; and that you did so in order to compel a certain person known to you as Jaime Spencer Aguirre, but who was, in fact, Special Agent Rene Medina, to pay a ransom for the release of Santiago Sahagun.

Now, do you understand what the Government would be obligated to prove for you to be convicted of having taken a hostage, Mr. Blancas?

Blancas: Yes, sir.

The Court: To the single-count Information accusing you of hostage taking, how do you plead, sir, guilty or not guilty?

Blancas: Guilty, sir.[109]

Blancas listened to the Government recite in detail the evidence that it would present against him if he proceeded to trial, and when asked by the Court whether the Government's information was true and correct, agreed that it was, stating "Yes, sir, it's true. Yes, Your Honor." [110] The Court then accepted his plea of guilty.[111]

Blancas now argues that his sworn statements, made in open court, were the product of coercion and thus rendered his plea involuntary. In light of the record and the Court's own recollection of the proceeding, including the credibility and demeanor of Blancas, his counsel, and counsel for the Government, the Court cannot credit Blancas's present self-serving statements over his sworn statements during the plea hearing. It therefore concludes, as it did at the plea hearing, that Blancas understood the nature of the charges against him and the rights he would waive if he pleaded guilty, and thus, that his plea was voluntarily and intelligently made. The Court further finds that counsel took no action to undermine the voluntary and intelligent nature of his guilty plea. Because Blancas's claim lacks merit, the Court accordingly denies relief.

### C.  Ineffective assistance of counsel

Blancas contends that his attorneys rendered ineffective assistance because they were disorganized and unprepared for trial, only came to see him four times, allowed a jury to be picked outside Blancas' presence, failed to move to suppress evidence against him gathered by a jailhouse informant, and did not sufficiently explain the rights he would be giving up if he pleaded guilty.[112] For the reasons dis-

---

108.  *Id.* at 10–11.

109.  Plea Tr. at 12–13.

110.  *Id.* at 13–15; *see supra* text accompanying note 7.

111.  *See* Plea Tr. at 15.

112.  The Court will separately address the last aspect of Blancas' ineffective assistance claim (*i.e.,* that his attorneys rendered ineffective

cussed below, the Court concludes that Blancas' claim is without merit.

### 1. *Legal Standard*

The Supreme Court established the legal principles that govern ineffective assistance of counsel claims in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In *Wiggins v. Smith*, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), the Supreme Court reiterated that:

> An ineffective assistance of counsel claim has two components: A petitioner must show that counsel's performance was deficient, and that the deficiency prejudiced the defense. To establish deficient performance, a petitioner must demonstrate that counsel's representation "fell below an objective standard of reasonableness." We have declined to articulate specific guidelines for appropriate attorney conduct and instead have emphasized that "the proper measure of attorney performance remains simply reasonableness under prevailing professional norms." [113]

To establish that counsel's representation fell below an objective standard of reasonableness, a petitioner must overcome a strong presumption that his trial counsel's conduct fell within a wide range of reasonable professional assistance.[114] Reviewing courts are extremely deferential in scrutinizing counsel's performance, making every effort to eliminate the distorting effects of hindsight.[115] It is strongly presumed that counsel rendered adequate assistance and exercised reasonable professional judgment in making all significant decisions.[116] An attorney's strategic choices, usually based on information supplied by the defendant and from a thorough investigation of relevant facts and law, are virtually unchallengeable.[117] Counsel is neither required to advance every non-frivolous argument, nor to

assistance by failing to file a Notice of Appeal for him).

**113.** *Wiggins*, 539 U.S. at 521, 123 S.Ct. at 2535, 156 L.Ed.2d at 484 (internal citations omitted).

**114.** *See Darden v. Wainwright*, 477 U.S. 168, 184, 106 S.Ct. 2464, 2473, 91 L.Ed.2d 144, 159 (1986); *Strickland*, 466 U.S. at 687–91, 104 S.Ct. at 2064–2065; *Lackey v. Johnson*, 116 F.3d 149, 152 (5th Cir.1997); *Belyeu v. Scott*, 67 F.3d 535, 538 (5th Cir.1995).

**115.** *See, e.g., Lockhart v. Fretwell*, 506 U.S. 364, 372, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993); *Burger v. Kemp*, 483 U.S. 776, 789, 107 S.Ct. 3114, 3123, 97 L.Ed.2d 638, 654 (1987); *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065; *Green v. Johnson*, 116 F.3d 1115, 1122 (5th Cir.1997).

**116.** *See Strickland*, 466 U.S. at 690, 104 S.Ct. at 2066; *Drew v. Collins*, 964 F.2d 411, 422 (5th Cir.1992); *Duff–Smith v. Collins*, 973 F.2d 1175, 1182 (5th Cir.1992).

**117.** *See Boyle v. Johnson*, 93 F.3d 180, 187–88 (5th Cir.1996) (holding that an attorney's decision not to pursue a mental health defense or to present mitigating evidence concerning the defendant's possible mental illness was reasonable where counsel was concerned that such testimony would not be viewed as mitigating by the jury and that the prosecution might respond to such testimony by putting on its own psychiatric testimony regarding the defendant's violent tendencies); *West v. Johnson*, 92 F.3d 1385, 1406–09 (5th Cir. 1996) (holding that a trial counsel's failure to conduct further investigation into the defendant's head injury and psychological problems was reasonable where interviews with the defendant and the defendant's family failed to produce any helpful information); *cf. Wiggins*, 539 U.S. at 524, 123 S.Ct. at 2536 (holding that, in a capital case, counsel's decision not to expand its mitigation-defense investigation beyond presentence investigation report and Department of Social Services records, despite suggestions that additional, significant mitigating evidence existed, was itself unreasonable and fell below professional standards).

investigate every conceivable matter, nor to assert patently frivolous arguments.[118] Defense counsel is similarly not required to exercise clairvoyance during the course of a criminal trial.[119]

Even if counsel's performance falls below an objective standard of reasonableness, "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." [120] Accordingly, "any deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution." [121] In the context of guilty pleas, the "prejudice" analysis focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process.[122] "In other words, in order to satisfy the 'prejudice' requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." [123]

Because a convicted defendant must satisfy both prongs of the *Strickland* test, his failure to establish either deficient performance or prejudice under that test makes it unnecessary to examine the other prong.[124] Therefore, a convicted defendant's failure to establish that his counsel's performance fell below an objective standard of reasonableness avoids the need to consider the issue of prejudice.[125] Similarly, it is also unnecessary to consider whether counsel's performance was deficient where there is an insufficient showing of prejudice.[126] Moreover, mere conclusory allegations in support of claims of ineffective assistance of counsel are insufficient, as a matter of law, to raise a constitutional issue.[127]

## 2. *Discussion*

■ To prevail on his ineffective assistance claim, Blancas must show that Abraham and Smith performed their duties in a professionally unreasonable manner. He must additionally show that he suffered prejudice as a direct consequence of their deficient performance, if any. After due

118. *See Sones v. Hargett,* 61 F.3d 410, 415 n. 5 (5th Cir.1995) (stating that counsel cannot be deficient for failing to press a frivolous point); *United States v. Gibson,* 55 F.3d 173, 179 (5th Cir.1995) (stating that the Sixth Amendment does not require counsel to file meritless motions); *Smith v. Collins,* 977 F.2d 951, 960 (5th Cir.1992) (noting that the defense of a criminal case is not an undertaking in which everything not prohibited is required, nor does it contemplate the employment of wholly unlimited time and resources).

119. *See Sharp v. Johnson,* 107 F.3d 282, 290 n. 28 (5th Cir.1997) (citing *Garland v. Maggio,* 717 F.2d 199, 207 (5th Cir.1983) (holding that clairvoyance is not a required attribute of effective representation)).

120. *Strickland,* 466 U.S. at 691–92, 104 S.Ct. at 2066–67.

121. *Strickland,* 466 U.S. at 692, 104 S.Ct. 2067.

122. *Hill v. Lockhart,* 474 U.S. 52, 58–9, 106 S.Ct. 366, 370, 88 L.Ed.2d 203, 210 (1985).

123. *Id.*

124. *Strickland,* 466 U.S. at 700, 104 S.Ct. at 2071; *Green,* 116 F.3d at 1122; *see also Burnett v. Collins,* 982 F.2d at 928 (holding that the defendant bears the burden of proof on both prongs of the *Strickland* test).

125. *Hoskins,* 910 F.2d at 311; *Thomas,* 812 F.2d at 229–30.

126. *See Black,* 962 F.2d at 401; *Pierce,* 959 F.2d at 1302.

127. *See Kinnamon v. Scott,* 40 F.3d 731, 735 (5th Cir.1994) (holding that a petitioner's speculative complaints of ineffective assistance by appellate counsel did not warrant federal habeas relief).

consideration, the Court concludes that Blancas has failed to carry his burden under *Strickland.*

First, there is no factual basis to Blancas's claim that either Smith or Abraham allowed a jury to be picked without Blancas being present. Consistent with the Court's independent recollection, the record clearly shows that a jury was never empaneled in this case. Moreover, as discussed regarding Blancas' claim that his plea was involuntary, the Court credits Abraham's testimony at the evidentiary hearing that he never told Blancas that a jury had been empaneled or that a juror had previously been a hostage. Furthermore, Blancas' claim that his attorneys failed to challenge the evidence gathered against him by a jailhouse informant is flatly contradicted by the record in this case. His claim is similarly contradicted by Abraham's credible and detailed testimony regarding the defense team's efforts to limit the damage wreaked by Blancas' statements to his cell mate. The record shows that Abraham both attempted and partially succeeded in suppressing Blancas' jailhouse statements.[128]

Blancas' claims that counsel, presumably Abraham, was unprepared and disorganized are conclusory and completely belied by the record in this complex case. The number and quality of motions filed on Blancas' behalf, together with supporting memoranda, evidence a well-planned and well-executed strategy in a case that became increasingly difficult to defend due to Blancas' own conduct while detained awaiting trial. There is certainly no lack of preparation to be discerned from the transcript of the plea and sentencing hearing, nor has Blancas come forward with any evidence to overcome the presumption that Abraham and Smith performed adequately.

To the extent Blancas complains that Abraham did not visit him often enough, he has not shown how an attorney performs deficiently *per se* by visiting his client in person only four times. Further, the Court credits Smith's testimony regarding her own and Abraham's respective responsibilities in Blancas' overall representation and concludes that Blancas has not shown that such division of labor between co-counsel was professionally unreasonable. Finally, the Court credits Abraham and Smith's testimony regarding the frequency and nature of their contact with Blancas and overall work on the case.

Finally, even if the Court were to take Blancas's allegations at face value, it finds that he has failed to satisfy the prejudice prong of *Strickland.* The Court has carefully considered: (1) the record; (2) the fact that, without the benefit of a plea agreement, which provided for the dismissal of the multiple remaining counts in the Indictment, Blancas faced a automatic life sentence if convicted; and (3) the Court's own recollection of the proceeding, including the credibility and demeanor of Blancas, his counsel, and counsel for the Government. It concludes that Blancas has not shown a reasonable probability that, but for counsel's purported errors, he would not have pleaded guilty and would have insisted on going to trial. Because the Court determines that Blancas has failed to satisfy either prong of the *Strickland* standard for ineffective assistance of counsel, it further finds that his ineffective assistance claim should be dismissed.

### D. Blancas' attorneys rendered ineffective assistance by failing to file a notice of appeal.

Blancas lastly claims that his attorneys failed to file a Notice of Appeal for him

---

**128.** *See* Def.'s Mot. to Suppress Evidence Derived from Gov't Misconduct, dated April 3, 2004, Docket no. 128; *see also* Court's Order, dated April 29, 2002, Docket no. 136.

after he requested them to do so. But for their deficient performance, Blancas argues, he would have appealed.

1. *Legal standard: Ineffective Assistance for Failing to File a Notice of Appeal*

The Supreme Court held in *Roe v. Flores–Ortega*, 528 U.S. 470, 120 S.Ct. 1029, 145 L.Ed.2d 985 (2000), that the *Strickland* test for ineffective assistance of counsel applies to claims that counsel was constitutionally ineffective for failing to file a notice of appeal.[129] It explained:

> Counsel has a constitutionally-imposed duty to consult with the defendant about an appeal when there is reason to think either (1) that a rational defendant would want to appeal (for example), because there are nonfrivolous grounds for appeal, or (2) that this particular defendant reasonably demonstrated to counsel that he was interested in appealing.[130]

It emphasized that "a lawyer who disregards specific instructions from the defendant to file a notice of appeal acts in a manner that is professionally unreasonable."[131] Moreover, to demonstrate prejudice, a defendant is not required to identify specific issues or show the likelihood of success on the merits if counsel's deficient performance deprived him of the appellate proceeding altogether.[132]

> Although showing nonfrivolous grounds for appeal may give weight to the contention that the defendant would have appealed, a defendant's inability to specify the points he would raise were his right to appeal reinstated will not fore-

close the possibility that he can satisfy the prejudice requirement where there are other substantial reasons to believe that he would have appealed. We ... conclude ... that it is unfair to *require* an indigent, perhaps *pro se,* defendant to demonstrate that his hypothetical appeal might have had merit before any advocate has ever reviewed the record in his case in search of potentially meritorious grounds for appeal. Rather, we require the defendant to demonstrate that, but for counsel's deficient conduct, he would have appealed.[133]

With these principles in mind, the Court turns to Movant's claim that counsel rendered ineffective assistance by failing to file a Notice of Appeal on Movant's behalf.

2. *Discussion*

██ Blancas contends that he told his attorneys that he wanted to appeal, but that they did not do so. But for his attorneys' failure to file a Notice of Appeal, he insists, he would have filed an appeal. However, the uncontradicted testimony in this case strongly supports a finding that Blancas never indicated that he wanted to appeal, much less that he expressly asked either Smith or Abraham to do so. The Court credits Abraham and Smith's testimony that they fully advised him about the waiver of his appellate rights and that he did not thereafter ask them to file a notice of appeal on his behalf.

Moreover, the Court finds that no rational defendant in Blancas' position would have wanted to appeal. Given the Government's evidence against him, the likelihood of a conviction and life imprisonment if he

**129.** *Roe v. Flores–Ortega,* 528 U.S. at 477, 120 S.Ct. at 1035, 145 L.Ed. at 994–95.

**130.** *Id.* at 480, 120 S.Ct. at 1036.

**131.** *See id.* at 477, 120 S.Ct. at 1034.

**132.** *See id.* at 482–3, 120 S.Ct. at 1037–38.

**133.** *See id.* at 486, 120 S.Ct. at 1039–40 (internal citations omitted) (emphasis in original).

chose to stand trial was extremely high, if not virtually certain. A 300–month sentence, while undeniably lengthy, presented a far better alternative to spending life in prison. After considering: (1)the state of the evidence against Blancas; (2) the fact that, under the terms of the plea agreement, he would serve only a 25–year sentence rather than life in prison; (3) the express waiver of his appellate rights; (4) his communicated desire to put the matter behind him; and (5) his failure to establish that he instructed counsel to appeal, the Court rejects Blancas' claim that Abraham or Smith performed deficiently in not pursuing an appeal on Blancas' behalf. Because Blancas must satisfy both prongs of the *Strickland* test, his failure to establish deficient performance makes it unnecessary to examine the prejudice prong. Blancas is not entitled to relief to the relief he seeks.

## V. *CERTIFICATE OF APPEALABILITY*

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") converted the "certificate of probable cause" required to appeal from the denial of a petition for federal habeas corpus relief, including the denial of § 2255 Motions to Vacate, into a Certificate of Appealability ("CoA").[134] To appeal the denial of a habeas corpus petition filed under 28 U.S.C. § 2255, the petitioner must obtain a CoA. [135] Appellate review of a habeas petition is moreover limited to the issues on which a CoA is granted.[136] In other words, a CoA is granted or denied on an issue-by-issue basis, thereby limiting appellate review to solely those issues on which CoA is granted.[137]

A CoA to appeal the denial of a habeas corpus petition shall be granted only upon "a substantial showing of the denial of a constitutional right." [138] The showing necessary to obtain a CoA on a particular claim depends upon the manner in which the District Court has disposed of a claim. If this Court rejects a prisoner's constitutional claim on the merits, he must then demonstrate that reasonable jurists could find the Court's assessment of the consti-

**134.** *See Hill v. Johnson*, 114 F.3d 78, 80 (5th Cir.1997) (recognizing that the "substantial showing" requirement for a CoA under the AEDPA is merely a change in nomenclature from the certificate of probable cause standard); *Muniz v. Johnson*, 114 F.3d 43, 45 (5th Cir.1997) (holding that the standard for obtaining a CoA is the same as for a CPC); *see also Robison v. Johnson*, 151 F.3d 256, 259 n. 2 (5th Cir.1998), *cert. denied,* 526 U.S. 1100, 119 S.Ct. 1578, 143 L.Ed.2d 673 (1999) (stating that the CoA requirement supersedes the previous requirement for a certificate of probable cause to appeal for federal habeas corpus petitions filed after the effective date of the AEDPA); *Hallmark v. Johnson,* 118 F.3d 1073, 1076 (5th Cir.1997), *cert. denied sub nom. Monroe v. Johnson,* 523 U.S. 1041, 118 S.Ct. 1342, 140 L.Ed.2d 502 (1998) (same).

**135.** *See Miller–El v. Cockrell,* 537 U.S. 322, 335–6, 123 S.Ct. 1029, 1039, 154 L.Ed.2d 931, 949 (2003); 28 U.S.C.A. § 2253(c)(2) (West Supp.2003).

**136.** *See Crutcher v. Cockrell,* 301 F.3d 656, 658 n. 10 (5th Cir.2002), (holding that a CoA is granted on an issue-by-issue basis, thereby limiting appellate review to those issues); *Jones v. Cain,* 227 F.3d 228, 230 n. 2 (5th Cir.2000) (holding the same); *Lackey v. Johnson,* 116 F.3d 149, 151 (5th Cir.1997) (holding that the scope of appellate review of denial of habeas petition is limited to issue on which CoA granted).

**137.** *See Crutcher v. Cockrell,* 301 F.3d at 658 n. 10; *Lackey v. Johnson,* 116 F.3d at 151; *Hill v. Johnson,* 114 F.3d at 80; *Muniz v. Johnson,* 114 F.3d at 45; *Murphy v. Johnson,* 110 F.3d 10, 11 n. 1 (5th Cir.1997); 28 U.S.C.A. § 2253(c)(3) (West Supp.2003).

**138.** 28 U.S.C. § 2253(c)(2); *Miller–El v. Cockrell,* 537 U.S. 322, 327, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003).

539

tutional claim to be debatable or wrong.[139] If the petitioner wishes to challenge this Court's dismissal of a claim for a reason not of constitutional dimension, such as procedural default, limitations, or lack of exhaustion, he must show that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and whether this Court was correct in its procedural ruling.[140] This Court is authorized to address the propriety of granting a CoA *sua sponte.*[141]

After considering the entire record and the parties' pleadings, the Court concludes that jurists of reason would not debate whether Blancas has stated a valid claim or whether a procedural ruling in this case is correct. Accordingly, the Court declines to issue a certificate of appealability regarding any of Blancas' claims for relief.

## VI. *CONCLUSION*

For the reasons discussed above, the Court concludes that Movant Marco Antonio Blancas is not entitled to relief regarding any of his claims, nor is he entitled to a certificate of appealability. Accordingly,

**IT IS ORDERED** that Movant Marco Antonio Blancas' Motion to Vacate, Set Aside or Correct Sentence, filed pursuant to 28 U.S.C. § 2255 on August 11, 2003, is **DISMISSED WITH PREJUDICE.**

**IT IS FURTHER ORDERED** that a certificate of appealability is **DENIED.**

**139.** *Miller–El v. Cockrell,* 537 U.S. at 338, 123 S.Ct. at 1040.

**140.** *Slack v. McDaniel,* 529 U.S. 473, 484, 120 S.Ct. 1595, 1604, 146 L.Ed.2d 542 (holding that when a district court denies a habeas claim on procedural grounds, without reaching the underlying constitutional claim, a CoA may issue only when the petitioner shows that

**IT IS FINALLY ORDERED** that all pending motions, if any, are **DENIED AS MOOT.**

reasonable jurists would find it debatable whether: (1) the claim is a valid assertion of the denial of a constitutional right; and (2) the district court's procedural ruling was correct).

**141.** *Alexander v. Johnson,* 211 F.3d 895, 898 (5th Cir.2000).